**THE UNITED STATES DISTRICT COURT**
**DISTRICT OF EASTERN NORTH CAROLINA**

| | |
|---|---|
| MICHEAL PAPETTI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>DICOM GRID, INC. d/b/a AMBRA HEALTH and INTELERAD, INC. d/b/a INTELERAD MEDICAL SYSTEMS,<br><br>Defendants. | Case No.:<br><br><br><br><br>DEMAND FOR A JURY TRIAL |

**CLASS ACTION COMPLAINT**

Plaintiff Michael Papetti, individually and on behalf of all others similarly situated ("Class"), brings this action against Defendants DICOM Grid, Inc. d/b/a Ambra Health ("Ambra Health") and Intelerad, Inc. d/b/a Intelerad Medical Systems ("Intelerad") (together, "Defendants") and alleges, upon personal knowledge as to his own acts and experiences and, where indicated, upon information and good faith belief, as follows:

**NATURE OF THE ACTION**

1. Plaintiff brings this class action on behalf of themselves and a Class of similarly situated individuals whose highly sensitive protected health information ("PHI") and personally identifiable information ("PII") (collectively, "Sensitive Information") was compromised due to Defendants' failure to adequately secure, monitor, and maintain their medical imaging platform and related systems (the "Platform").

2. Defendants' Platform is used by healthcare providers across the United States to store, transmit, and access Sensitive Information, including medical images and related data. The Platform enables collaborative care among hospitals, radiology practices, and clinical research institutions.

3. As part of their Platform, Defendants integrated and relied on third-party software SimpleHelp Remote Monitoring and Management ("SimpleHelp"), which allows Platform users to remotely access onsite computer systems and patient Sensitive Information.

4. However, Defendants failed to securely implement, configure, and monitor SimpleHelp. This misconfiguration introduced a critical vulnerability across Ambra Health's network and the systems of its healthcare clients, allowing unauthorized third parties to access and exfiltrate Sensitive Information from the Platform (the "Data Breach"), including, but not limited to, individuals' names, address(es) information, telephone number(s), date(s) of birth, email address(es), Social Security number, driver's license or state identification card number(s), treatment or diagnosis information, provider(s) name(s), medical record number(s) or patient identification number(s), health insurance information, and other health-related records.[1]

5. Despite the widespread scope of the Data Breach and the number of healthcare institutions affected, Defendants failed to promptly notify impacted individuals or disclose the extent and duration of the Data Breach, the types of data accessed, or whether affected data remained in unauthorized hands. To the extent that any notice communications were issued, they lacked the material details necessary—including what data was exposed, when it was exposed, or whether any attempt had been made to contain the exposure—for affected individuals to understand the nature of the Data Breach or take protective steps.

6. The exposure of Sensitive Information to unauthorized threat actors leaves Plaintiff and Class Members vulnerable to identity theft, medical fraud, financial crimes, and other forms of

---

[1] *See, e.g., Ransomware Actors Exploit Unpatched SimpleHelp Remote Monitoring and Management to Compromise Utility Billing Software Provider* (June 12, 2025), https://www.cisa.gov/news-events/cybersecurity-advisories/aa25-163a (last visited October 3, 2025).

harm. Such information is of high value to cybercriminals and can be misused for years after initial compromise.

7. Plaintiff and Class Members have already taken significant steps to mitigate these risks, including contacting insurers and financial institutions, placing fraud alerts and credit freezes, cancelling and requesting new bank and credit cards, and closely monitoring personal and medical accounts for suspicious activity.

8. The risks resulting from Defendants' misconduct are ongoing. Plaintiff and Class Members remain at substantial and continuing risk of identity theft, financial loss, and loss of privacy as a result of the Data Breach.

9. Plaintiff seeks damages, injunctive and equitable relief, attorneys' fees, costs, and expenses on behalf of himself and all similarly situated individuals whose Sensitive Information was compromised due to Defendants' conduct.

10. Accordingly, Plaintiff asserts the following causes of action: (i) Negligence, (ii) Negligence Per Se, (iii) Invasion of Privacy, (iv) Breach of Implied Contract, (v) Unjust Enrichment, (vi) Breach of Fiduciary Duty, (vii) Breach of Third-Party Beneficiary Contract, (viii) Bailment, and (ix) Violation of the Washington State Consumer Protection Act RCW 19.86.010 *et seq*.

**PARTIES**

11. Plaintiff Michael Papetti is a natural person and citizen of Washington residing in Ferndale, Washington.

12. Defendant DICOM Grid, Inc. d/b/a Ambra Health, a corporation organized under the laws of the State of Delaware, maintains its principal place of business at 305 Church at N. Hills St., 6th Floor, Raleigh, North Carolina 27609.

13. Defendant Intelerad, Inc., a corporation organized under the laws of the State of Delaware, maintains its principal place of business at 305 Church at N. Hills St., 6th Floor, Raleigh, North Carolina 27609.[2] Intelerad is the sole owner of Ambra Health.

14. Upon information and belief, Intelerad, Inc. does business in the United States of America as Intelerad Medical Systems and/or Intelerad.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)("CAFA") because there are more than 100 alleged putative class members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one class member is a citizen of a state different from Defendants.

16. This Court has personal jurisdiction over Defendants in this action under 28 U.S.C. § 1391(b) and 28 U.S.C. § 113 because they maintain their principal place of business in Raleigh, North Carolina, and conduct substantial business in this District.

17. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Defendants principal place of business is located in this District and a substantial part of the events and omissions giving rise to this action occurred in this District.

## COMMON FACTUAL ALLEGATIONS

### A. Defendants Collected, Maintained, and Stored Sensitive Information.

18. Defendants develop and offer cloud-based medical imaging software and services that are used by healthcare providers nationwide via Defendants' Platform to store, manage, and share

[2] Intelerad is a Canadian company with principal offices in Montreal, Canada and Raleigh, North Carolina. *See Our Offices*, INTELERAD, https://www.intelerad.com/en/contact-us/#offices?tab=United-States (last visited October 3, 2025)

medical images, enabling collaborative care across hospitals, radiology practices, and research organizations.

19. Defendants implemented and integrated a third-party software tool known as SimpleHelp into their Platform.

20. Through the Platform, Defendants collect, process, and maintain vast amounts of Sensitive Information belonging to the patients of their healthcare provider clients.

21. When healthcare providers use Defendants' Platform to upload and manage patients' medical images, they transmit their patients' Sensitive Information—including, but not limited to, names, dates of birth, medical record numbers, radiology reports, PII, PHI, and other patient data—which is then stored on Defendants' cloud-based systems.

22. Patients are required to provide this information to their healthcare providers to receive medical services. Defendants insert themselves into this sensitive process by undertaking a critical component of healthcare auxiliary support that also requires access to patients' Sensitive Information as a condition for Defendants' providing access to the Platform.

23. By collecting, storing, and processing this Sensitive Information, Defendants assumed a duty to adequately protect it from unauthorized access and disclosure.

24. Defendants also promise in their online privacy policy (the "Privacy Policy") that they will protect Sensitive Information in a manner consistent with industry standards, stating: "What data we store, we'll protect within commercially acceptable means to prevent loss and theft, as well as unauthorized access, disclosure, copying, use or modification."[3]

---

[3] *Privacy Policy*, https://ambra.app/privacy-policy (last visited October 3, 2025).

25. Due to the nature and volume of PHI and PII that Defendants maintain, their systems are an attractive target for cybercriminals seeking to exploit or monetize patient data by selling it on the dark web, engineering identity theft and fraud, engaging in blackmail, and more.

26. Defendants publicly represent in the Privacy Policy that they understand and prioritize the importance of safeguarding individual personal and health information, noting that "[y]our privacy is important to us."[4]

27. Plaintiff and Class Members, as patients whose data was processed through Defendants' Platform, reasonably relied on Defendants to implement and maintain adequate data security practices to protect their Sensitive Information from unauthorized access.

28. Defendants derive substantial revenue from their provision of cloud-based medical imaging services to healthcare providers and, in doing so, collect and store the Sensitive Information of patients like Plaintiff and Class Members.

29. By integrating and relying on the SimpleHelp software tool in their systems, Defendants assumed legal and equitable obligations to protect that data and knew, or should have known, that vulnerabilities in third-party components could expose Sensitive Information, including patient data, to unauthorized access.

**B. Defendants' Data Breach Exposed Patients' Sensitive Information.**

30. Upon information and belief, one or more third-party threat actors exploited known vulnerabilities in the SimpleHelp software that Defendants integrated into the Platform, gaining unauthorized access to files containing Sensitive Information.[5]

---

[4] *Id.*

[5] *See, e.g., SimpleHelp Remote Access Software Vulnerable to Ransomware Attacks,* The American Hospital Ass'n (January 29, 2025), https://www.aha.org/2025-01-29-simplehelp-remote-access-software-vulnerable-ransomware-attacks; (last visited October 3, 2025). *See also Ransomware Actors Exploit Unpatched SimpleHelp Remote Monitoring and Management to*

31. This Data Breach resulted in the exposure of medical images and associated patient information, including names, dates of birth, medical record numbers, radiology reports, and health-related data stored on Defendants' systems.

32. Defendants could have prevented the Data Breach by conducting proper due diligence of third-party software, implementing adequate security safeguards, identifying all instances of the SimpleHelp application within Defendants' clients' systems, implementing mitigating measures including applying appropriate patches, and encrypting the data stored within their systems.

33. Instead, Defendants failed to use reasonable security practices and did not encrypt and/or securely store Sensitive Information, nor did they ensure the removal of unnecessary or outdated files from their systems.

34. As a result of these failures, unauthorized actors were able to access and exfiltrate unencrypted PHI and PII belonging to Plaintiff and Class Members.

35. Despite knowledge of the Data Breach and compromise of patient Sensitive Information, Defendants have not provided notice to all affected individuals, leaving many patients unaware that their most sensitive information may be in the hands of cybercriminals.

36. Defendants' failure to notify impacted individuals violates federal and state data breach notification laws, including the Health Insurance Portability and Accountability Act ("HIPAA"), which require prompt disclosure following the unauthorized acquisition of PHI.

### C. Defendants Knew or Should Have Known of the Risk of Being Targeted by Third-Party Threat Actors Because Institutions in Possession of Sensitive Information Are Frequently Targeted in Cyberattacks.

---

*Compromise Utility Billing Software Provider*, Cybersecurity & Infrastructure Security Agency (June 12, 2025), https://www.cisa.gov/news-events/cybersecurity-advisories/aa25-163a. (last visited October 3, 2025).

37. Given that Defendants were storing the Sensitive Information of Plaintiff and Class Members and knew or should have known of the serious risk and harm caused by a data breach, Defendants were obligated to implement reasonable measures to prevent and detect cyber-attacks, such as those recommended by the Federal Trade Commission (the "FTC"), required under HIPAA, and promoted by data security experts and other agencies.

38. That obligation stems from the foreseeable risk of a data breach given that Defendants collected, stored, and had access to a swath of highly sensitive patient and employee records and data and, additionally, because other highly publicized data breaches at numerous healthcare institutions put Defendants on notice that the personal and sensitive data it stores might be targeted by cybercriminals.

39. Indeed, cyberattacks on medical systems and healthcare companies, like Defendant Ambra Health, have become so notorious that the Federal Bureau of Investigation and United States Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[6]

40. In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in recent years.[7]

---

[6] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomeware,* Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomeware (via subscription content - last visited October 3, 2025).

[7] *See* Maria Henriquez*, Iowa City Hospital Suffers Phishing Attack,* Security Magazine (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack (last visited October 3, 2025).

41. Therefore, the increase in such attacks, and the attendant risk of future attacks, was widely known to the public, as well as to anyone in Defendants' industry—including Defendants.

42. Despite the abundance and availability of information regarding cybersecurity best practices for the healthcare industry, and despite the prevalence of healthcare data breaches, Defendants inexplicably failed to adopt sufficient data security process by, without limitation:

a. Failing to properly select information security partners;

b. Failing to ensure the proper monitoring and logging of the ingress and egress of network traffic;

c. Failing to ensure the proper monitoring and logging of file access and modifications;

d. Failing to ensure the proper training their and their technology partners' employees as to cybersecurity best practices;

e. Failing to ensure fair, reasonable, or adequate computer systems and data security practices to safeguard the PII and PHI of Plaintiff and Class Members;

f. Failure to timely and accurately send notice indicating that Plaintiff's and Class Members' PII and PHI had been improperly acquired or accessed;

g. Knowingly disregarding standard information security principles, despite obvious risks, by allowing unmonitored and unrestricted access to unsecured PII and PHI; and

h. Failing to provide adequate supervision and oversight of the PII and PHI with which it was and is entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted an unknown third party to gather PII and PHI of Plaintiff and Class Members, misuse the PHI/PII and potentially disclose it to others without consent.

43. Upon information and belief, Defendants further failed to ensure the proper implementation of sufficient processes to quickly detect and respond to data security incidents, to ensure the proper encryption of Plaintiff's and Class Members' Sensitive Information, and to monitor user behavior and activity to identify possible threats.

44. Upon information and belief, Defendants failed to ensure properly monitor instances of a vulnerability in SimpleHelp software and implement available and recommended mitigations.

45. Time is of the essence when highly sensitive PII and PHI is subject to unauthorized access and/or acquisition.

46. The disclosed, accessed, and/or acquired PII and PHI of Plaintiff and Class Members is, upon information and good faith belief, already available on the Dark Web.

47. Hackers can access and then offer for sale the unencrypted, unredacted PII and PHI to criminals.

48. Plaintiff and Class Members are now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from the publication of their PHI and PII onto the Dark Web.

49. Plaintiff and Class Members now face a lifetime risk of identity theft, which is heightened here by unauthorized access, disclosure, and/or activity by cybercriminals on computer systems containing sensitive personal information.

50. Despite the highly sensitive nature of the information that Defendants obtained, maintained, and stored and the prevalence of healthcare data breaches, Defendants inexplicably failed to take appropriate steps to safeguard the Sensitive Information of Plaintiff and Class Members from being compromised.

51. The Data Breach itself, and information Defendants disclosed about the breach to date—including its length, the need to remediate Defendants' cybersecurity, the number of people impacted, and the sensitive nature of the impacted date—collectively demonstrate Defendants

failed to implement reasonable measures to prevent cyber-attacks and exposure of the Sensitive Information they oversaw.

**D. Defendants Failed to Comply with FTC Guidelines.**

52. The FTC recognizes that consumer data is a lucrative and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour underscored this point by reiterating that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[8]

53. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

54. In 2016, the FTC updated its publication *Protecting Personal Information: A Guide for Business*, which established best practice cyber-security guidelines for business.

55. Those guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems.[9]

56. The FTC further recommends that companies do not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data; require complex passwords

---

[8] Pamela Jones Harbour, *Remarks Before FTC Exploring Privacy Roundtable* (Dec. 7, 2009), https://www.ftc.gov/news-events/news/speeches/remarks-ftc-exploring-privacy-roundtable (last visited October 3, 2025).

[9] *Protecting Personal Information: A Guide for Business* (2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited October 3, 2025).

to be used on networks, use industry-tested methods for security, monitor for suspicious activity on the network, and verify that third party service providers have implemented reasonable security measures.[10]

57. The FTC has also issued, and regularly updates, guidelines for businesses to implement reasonable data security practices and incorporate security into all areas of the business.

58. According to the FTC, reasonable data security protocols require:

a. Encrypting the information stored on computer networks;

b. Retaining payment card information only as long as necessary;

c. Properly disposing of personal information that is no longer needed or can be disposed pursuant to relevant state and federal laws;

d. Limiting administrative access to business systems

e. Using industry approved activity;

f. Monitoring activity on networks to uncover non-approved activity;

g. Verifying that privacy and security features function properly;

h. Testing for common vulnerabilities; and

i. Updating and patching third-party software.[11]

59. The FTC cautions businesses that failure to protect Sensitive Information, and the resulting data breaches, can destroy consumers' finances, credit history, and reputations, and can take time, money, and patience to resolve the effect of a data breach.[12] Indeed, the FTC treats the failure to implement reasonable and adequate data security measures—like Defendants failed to

[10] *Start with Security: A Guide for Business* (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited October 3, 2025).
[11] *Id.*
[12] *See Taking Charge, What to Do if Your Identity is Stolen*, at 3 (Jan. 2012), https://www.ojp.gov/ncjrs/virtual-library/abstracts/taking-charge-what-do-if-your-identity-stolen (last visited October 3, 2025).

do so here—as an unfair act prohibited by Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45.

60. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act of practice prohibited by Section 5 of the FTC Act.

61. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

62. These FTC enforcement actions include actions against healthcare providers and partners such as Defendants here.

63. Defendants failed to properly implement basic data security practices including monitoring their use and implementation of third-party software.

64. Defendants further failed to apply appropriate solutions for patching SimpleHelp's vulnerabilities.

65. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to customer's Sensitive Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

66. On information and good faith belief Plaintiff alleges that Defendants were at all times fully aware of the obligation to protect the Sensitive Information of their clients' patients. Defendants were also aware of the significant repercussions that would result from their failure to do so.

**E. Defendants Failed to Comply with Industry Standards.**

67. As referenced herein, experts studying cybersecurity routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the Sensitive Information which they collect and maintain.

68. Several best practices have been identified that, at a minimum, should be implemented by companies, such as Defendants, operating in the healthcare industry, including, but not limited to: educating all employees; monitoring any potential vulnerabilities in third-party software; applying available mitigations for third-party software vulnerabilities; using strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

69. The United States Government and the United States Cybersecurity & Infrastructure Agency recommend several similar and supplemental measures to prevent and detect cyberattacks, including, but not limited to: implementing an awareness and training program; enabling strong spam filters; scanning incoming and outgoing emails; configuring firewalls; automating anti-virus and anti-malware programs; managing privileged accounts; configuring access controls; disabling remote desktop protocol; and updating and patching computers.

70. Other best cybersecurity practices that are standard in the healthcare industry include, but are not limited to: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting of physical security systems; protecting against any possible communication system; and training staff regarding critical points.

71. Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1[13] (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet's Critical Security Controls[14] (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

72. The FBI's Internet Crime Complaint (IC3) 2019 estimated that there was more than $3.5 billion in losses to individual and business victims due to identity fraud in that reporting year alone. That same report identified "rapid reporting" as a tool to help law enforcement stop fraudulent transactions and mitigate losses.

73. These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendants, in failing to comply with these accepted standards, thereby opened the door to the cyber incident and caused the Data Breach.

**F. Defendants' Conduct and Insufficient Data Security Violate HIPAA.**

74. HIPAA requires covered entities and business associates to protect against reasonably anticipated threats to the security of sensitive patient health information.

---

[13] Nat'l Inst. of Standards & Tech., *Framework for Improving Critical Infrastructure Cybersecurity* (2018), https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf (last visited October 3, 2025).

[14] *See The 18 CIS Critical Security Controls*, https://www.cisecurity.org/controls/cis-controls-list (last visited October 3, 2025).

75. Business associates must implement safeguards to ensure the confidentiality and availability of PII and PHI. Safeguards must include physical, technical, and administrative components.[15]

76. Title II of HIPAA contains what is known as the Administrative Simplification provisions.[16] These provisions require, among other things, that the Department of Health and Human Services ("HHS") creates rule to streamline the standards for handling PII and PHI, like the data Defendants left unguarded.

77. The HHS subsequently promulgated multiple regulations under the authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. §164.306(a)(1)-(4); 45 C.F.R. §164.308(1)(i); 45 C.F.R. §164.308(a)(1)(ii)(D), and 45 C.F.R. §164.530(b).

78. A data breach, such as the one Defendants experienced, is considered a breach under the HIPAA rules because there is an access of PHI not permitted under the HIPAA Privacy Rule. A breach under the HIPAA Rules is defined as, "the acquisition, access, use, or disclosure of PHI in a manner not permitted under [the HIPAA Privacy Rule] which compromises the privacy of the PHI."[17] Business associates have direct liability for breaches under 45 C.F.R §164.402 *et seq.*

79. The Data Breach resulted from a combination of insufficiencies that Defendants failed to comply with safeguards maintained by HIPAA regulations and their obligations to covered entities.

---

[15] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

[16] 42 U.S.C. § 1301, *et seq.*

[17] *See* C.F.R. § 164.402.

80. Furthermore, persons, including business associates, that receive information from a confidential communication or record, as described above, "may not disclose the information except to the extent that disclosure is consistent with the authorized purposes for which the information was first obtained."[18]

81. Defendants' Data Breach and unauthorized disclosure of Plaintiff's and Class Members' Sensitive Information to malicious third parties and/or bad actors violated Plaintiff's and Class Members' rights to privacy and confidentiality related to their receipt of healthcare services and fell below the applicable standards for safeguarding the confidential Sensitive Information of Plaintiff and Class Members.

**G. The Data Breach Resulted from Defendants' Failure to Properly Maintain and Safeguard their Systems and Data**

82. Defendants breached their obligation to Plaintiff and Class Members and/or were otherwise negligent and reckless because they failed to properly maintain and safeguard their computer systems and data.

83. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Failing to adequately protect their clients' and their clients' patients' Sensitive Information;

c. Failing to properly monitor their own data security systems for existing intrusions;

d. Failing to ensure that their vendors with access to their computer systems employed reasonable security procedures;

[18] 45 C.F.R. § 164.502(A)(3).

e. Failing to detect unauthorized ingress into their systems;

f. Failing to implement and monitor reasonable network segmentation to detect unauthorized travel within their systems, including to and from areas containing the most sensitive data;

g. Failing to detect unauthorized exfiltration of the most sensitive data on their system;

h. Failing to train their employees in the proper handling of emails containing Sensitive Information and maintain adequate email security practices;

i. Failing to ensure the confidentiality and integrity of electronic PHI they created, received, maintained, and/or transmitted, in violation of 45 C.F.R. §164.306(a)(1);

j. Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. §164.312(a)(1);

k. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. §164.308(a)(1)(i);

l. Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. §164.308(a)(1)(ii)(D);

m. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. §164.306(a)(3);

n. Failing to ensure compliance with HIPAA security standard rules by their workforce in violation of 45 C.F.R. §164.306(a)(4);

o. Failing to train all members of their workforce effectively on the policies and procedures regarding PHI as necessary and appropriate for the members of its workforces to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. §164.530(b);

p. Failing to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals, as they had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key";

q. Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act, and

r. Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Sensitive Information.

84. Defendants negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Sensitive Information. Accordingly, as outlined below, Plaintiff and Class Members now face actual fraud and identity theft as well as increased risk of fraud and identity theft. In addition, Plaintiff and Class Members lost the benefit of the bargain they made with Defendants.

### G. Cyberattacks and Data Breaches Cause Disruption and Put Victims at an Increased Risk of Fraud and Identity Theft.

85. Cyberattacks and data breaches at companies in the healthcare industry like Defendants are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

86. Indeed, researchers have found that among medical services providers that experience a data security incident, the death rate among patients increased in the months and years after the attack.[19]

87. Researchers have further found that at medical service providers that experienced a data security incident, the incident was associated with deterioration in timeliness and patient outcomes, generally.[20]

---

[19] *See* Nsikan Akpan, *Ransomware and Data Breaches Linked to Uptick in Fatal Heart Attacks,* PBS (Oct. 24, 2019), https://www.pbs.org/newshour/science/ransomware-and-other-data-breaches-linked-to-uptick-in-fatal-heart-attacks (last visited October 3, 2025).

[20] *See* Sung J. Choi *et al.*, *Data Breach Remediation Efforts and Their Implications for Hospital Quality*, 54 Health Services Res. 971, 971-80 (2019), https://www.onlinelibrary.wiley.com/doi/full/10.1111/1475-6773.13203 (last visited October 3, 2025).

88. The United States Government Accountability Office ("GAO") released a report in 2007 regarding data breaches in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[21]

89. That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal Sensitive Information is to monetize it.

90. Monetization by bad actors occurs by them selling the spoils of cyberattacks on the black market to identify thieves who desire to extort and harass victims, take over victims' identities, and in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate the piece of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or otherwise harass or track the victim.

91. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique called "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security Number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls, text messages, and/or phishing emails.

92. The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for seven years if

---

[21] *Report to Congressional Requesters*, GAO, at 2 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf (the "GAO Report") (last visited October 3, 2025).

someone steal their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[22]

93. Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

94. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name with the thief's picture; use the victim's name and Social Security number to obtain government benefits; and/or file a fraudulent tax return using the victim's information.

95. In addition, thieves may obtain a job using the victim's Social Security Number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest (resulting in an action issued against victim's name).

96. Moreover, theft of PII is gravely serious because PII is an extremely valuable property right.[23]

97. Sensitive Information's value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison

---

[22] *See IdentityTheft.gov/Steps,* https://www.identitytheft.gov/steps (last visited October 3, 2025 – temporarily inaccessible due to federal government shutdown).

[23] *See, e.g.,* John T. Soma *et al.*, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets,* 15 Rich J.L. & Tech. 11, at 3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

sentences. This obvious risk-to-reward analysis illustrates that, beyond doubt, Sensitive Information has considerable market value.

98. Theft of PHI, in particular, is gravely serious. A thief may use customers' and patients' name or health insurance identification numbers "to see a doctor, get prescription drugs, buy medical devices, submit claims with [an] insurance provider, or get other medical care. If the thief's health information is mixed with yours, it could affect the medical care you're able to get or the health insurance benefits you're able to use. It could also hurt your credit."[24]

99. Drug manufacturers, medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase Sensitive Information on the black market for the purpose of target-marketing their products and services to specific physical maladies of the data breach victims themselves. Insurance companies also purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

100. There may additionally be a substantial time lag—measured in years—between when harm occurs and when it is discovered, and also between when Sensitive Information and/or financial information is stolen and when it is used.

101. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[25]

---

[24] *What to Know About Medical Identity Theft,* https://www.ftc.gov/articles/what-know-about-medical-identity-theft (last visited October 3, 2025 – temporarily inaccessible due to federal government shutdown).

[25] *The GAO Report*, *supra* n.21.

102. Sensitive Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

103. There is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

104. Plaintiff and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

105. PHI can sell for as much as $363 per record according to the Infosec Institute.[26]

106. PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of the information and damage to victims may continue for years.

107. For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[27] Such fraud may go undetected until debt collection calls commence months, or even years, later.

108. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.

109. Each of these fraudulent activities is difficult to detect.

---

[26] *Data Breaches: In the Healthcare Sector*, https://www.cisecurity.org/insights/blog/data-breaches-in-the-healthcare-sector (last visited October 7, 2025).

[27] *Identity Theft and Your Social Security Number* (2021), https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited October 3, 2025).

110. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud.

111. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

112. Moreover, it is not an easy task to change or cancel a stolen Social Security number.

113. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[28]

114. This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at the cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[29]

115. Medical information is also especially valuable to identity thieves.

---

[28] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back* (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identtiy-theft (last visited October 3, 2025).

[29] Tim Greene, *Anthem hack: Personal Data stolen sells for 10x price of stolen credit card numbers* (Feb 6. 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited October 3, 2025).

116. According to DeepStrike, standalone Social Security numbers were selling on the dark web for just $1 in 2025.[30] That pales in comparison with the asking price for medical data, with medical records selling between $250 to $1000, and up.[31]

117. Because of the value of its collected and stored data, the healthcare industry has experienced disproportionally higher numbers of data theft events than other industries.

118. For this reason, Defendants knew or should have known about these dangers and strengthened their data systems and data security measures accordingly. Defendants were put on notice of the substantial and foreseeable risk of harm from a data breach, yet failed to properly prepare for that risk.

**I. Plaintiff's and Class Members' Damages.**

119. Plaintiff and Class Members have been damaged by the compromise of their Sensitive Information in the Data Breach.

120. On information and belief, Plaintiff's and Class Members' Sensitive Information was compromised in the Data Breach and is now in the hands of cybercriminals who accessed the data Defendants held within their systems. The Sensitive Information exposed included the individuals' first and last names in combination with address information, telephone number, date of birth, email address, Social Security number, driver's license or state identification card number, treatment or diagnosis information, provider name, medical record number or patient identification number, health insurance information, and/or treatment cost information of current and former

[30] S*ee Dark Web Pricing* 2025 https://deepstrike.io/blog/dark-web-data-pricing-2025 (last visited October 7, 2025).

[31] Fernanda Ramirez, *The Dark Web & Healthcare: Why Your PHI is a Prime Target* (March 26, 2025) https://www.hipaavault.com/resources/dark-web-healthcare-phi/ (last visited October 7, 2025).

healthcare patients whose data was stored by Defendants, as well as Defendants' current and former employees.

121. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have been placed at a present, imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

122. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach, valuable time Plaintiff and Class Members otherwise would have spent on other activities, including but not limited to work and/or recreation.

123. Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

124. Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Sensitive Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

125. Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

126. Plaintiff and Class Members also suffered a loss of value of their Sensitive Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

127. Plaintiff and Class Members were also damaged via benefit-of-the-bargain damages. Plaintiff and Class Members who are current or former patients of Defendants' clients overpaid for a service that was intended to be accompanied by adequate data security that complied with industry standards.

128. Part of the price Plaintiff and Class Members paid to Defendants' clients was intended to be used by Defendants to fund adequate data security practices to safeguard Plaintiff's and Class Members' Sensitive Information. As demonstrated by the Data Breach, Defendants failed to fund and provide adequate data security practices. Thus, Plaintiff and the Class Members who are current or former patients of Defendants' clients did not get what they paid for and agreed to.

129. Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably spent to remedy or mitigate the effects of the Data Breach relating to:

a. Reviewing and monitoring sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

b. Purchasing credit monitoring and identity theft prevention;

c. Placing "freezes" and "alerts" with reporting agencies;

d. Spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;

e. Contacting financial institutions and closing or modifying financial accounts; and,

f. Closely reviewing and monitoring their medical insurance accounts, bank accounts, and credit reports, as well as alerts for identity fraud including their SSNs, for unauthorized activity for years to come.

130. Moreover, Plaintiff and Class Members have an interest in ensuring that their Sensitive Information, which is believed to remain in the possession of Defendants, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Sensitive Information is not accessible online or otherwise to unauthorized third parties.

131. Further, as a result of Defendants' conduct, Plaintiff and Class Members are forced to live with the anxiety that their Sensitive Information—which contains the most intimate details about a person's life, including what ailments they suffer, whether physical or mental—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

132. As a direct and proximate result of Defendants' actions and omissions, Plaintiff and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

**REPRESENTATIVE PLAINTIFF MICHAEL PAPETTI'S EXPERIENCE**

133. Plaintiff Michael Papetti was at times mentioned herein a patient of a healthcare provider that used Ambra Health's healthcare management products and services available through the Platform.

134. As a condition of using his healthcare provider's services, Plaintiff Papetti's Sensitive Information was provided to, and processed through, Defendants' systems.

135. This Sensitive Information was provided to Defendants with the reasonable expectation that Defendants would protect and secure the information from unauthorized access and disclosure.

136. Plaintiff provided his Sensitive Information to Defendants via his healthcare provider with the reasonable expectation that they would protect and secure it from unauthorized access and disclosure.

137. Upon information and good faith belief, Plaintiff's Sensitive Information—including his name, address information, telephone number, date of birth, email address, Social Security number, driver's license or state identification card number, treatment or diagnosis information, provider name, medical record number or patient identification number, health insurance information, and/or treatment cost information—have been improperly accessed or obtained by unauthorized third parties as a result of the Data Breach.

138. Plaintiff reasonably expected and understood that Defendants would take, at a minimum, industry-standard precautions to protect, maintain, and safeguard his Sensitive Information from unauthorized use or disclosure, and would timely notify him of any related data security incidents. Plaintiff would not have used healthcare services provided through Defendants had he known they would fail to take reasonable steps to safeguard his Sensitive Information.

139. Plaintiff is very careful about sharing his sensitive PII and PHI. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. He stores any documents containing sensitive information in a safe and secure location or destroys them. Moreover, he diligently chooses unique usernames and passwords for his online accounts.

140. As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact, including researching the Data Breach, reviewing financial statements, monitoring his credit information, and changing account passwords.

141. Plaintiff has spent significant time responding to the Data Breach and will continue to spend valuable time that otherwise would have been spent on other activities, including, but not limited. to work and/or recreation.

142. Plaintiff suffered actual injury from the exposure and/or theft of his Sensitive Information as a result of the Data Breach, including: (a) entrusting PII and PHI to Defendants under the mistaken belief that adequate data security was in place; (b) damages to and diminution in the value of his Sensitive Information, a form of intangible property; (c) loss of privacy; (d) continuous imminent and impending risk of financial, medical, and identity fraud and theft; and (e) time and expense of mitigation efforts.

143. Due to the Data Breach, Plaintiff anticipates spending considerable additional time and money on an ongoing basis to mitigate and address the resulting harm, including monitoring his medical history, health insurance data, and financial accounts.

144. Plaintiff has already experienced a sharp increase in spam calls and/or texts and phishing attempts.

145. Knowing that unauthorized actors accessed and/or stole his PII and PHI—which may be used for identity theft, fraud, and related harms—has caused Plaintiff anxiety, stress, and fear. These are precisely the types of harms recognized as cognizable injuries under the law.

146. Plaintiff has suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and experiences ongoing concern and anxiety over the loss of his privacy and the threat of cybercriminal misuse.

147. Plaintiff is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his Sensitive Information being in unauthorized hands.

148. Plaintiff has a continuing interest in ensuring that his Sensitive Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

149. Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all others similarly situated.

150. The Class that Plaintiff seeks to represent is defined as follows:

> All individuals residing in the United States whose Sensitive Information was impacted as a result of the Data Breach (the "Class").

151. The following people are excluded from the Class: (i) any judge or magistrate presiding over this action and members of their families; (ii) Defendants, Defendants' subsidiaries, parents, successors, predecessors, affiliated entities, and any entity in which Defendants or their parents have a controlling interest, and their current or former officers and directors; (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiff's counsel and Defendants' counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

152. Numerosity: The exact number of members of the Class is unknown but, upon information and belief, it is estimated to number in the tens or hundreds of thousands at this time, and individual joinder in this case is impracticable. Members of the Class can be easily identified through Defendants' records and objective criteria permitting self-identification in response to notice, and notice can be provided through techniques similar to those customarily used in other data breach, consumer breach of contract, unlawful trade practices, and class action controversies.

153. Commonality: There are questions of fact and law common to the Class which predominate over any questions affecting only individual members. The questions of law and fact common to the Class arising from Defendants conduct include, without limitation, the following:

a. Whether Defendants violated the laws asserted herein, including statutory privacy laws;

b. Whether Defendants had a duty to use reasonable care to safeguard Plaintiff's and Class Members' Sensitive Information;

c. Whether Defendants breached the duty to use reasonable care to safeguard Plaintiff's and Class Members' Sensitive Information;

d. Whether Defendants breached their contractual promises to safeguard Plaintiff's and Class Members' Sensitive Information;

e. Whether Defendants knew or should have known about the inadequacies of their data security policies and system and the dangers associated with storing Sensitive Information;

f. Whether Defendants failed to use reasonable care and commercially reasonable methods to safeguard and protect Plaintiff's and Class Members' Sensitive Information from unauthorized release and disclosure;

g. Whether the proper data security measures, policies, procedures, and protocols were in place and operational within any Defendants' computer systems to safeguard and protect Plaintiff's and Class Members' Sensitive Information from unauthorized release and disclosure;

h. Whether Defendants took reasonable measures to determine the extent of the Data Breach after it was discovered;

i. Whether any Defendants' method of informing Plaintiff and other members of the Class was unreasonable;

j. Whether Defendants' conduct was likely to deceive the public;

k. Whether Defendants are liable for negligence or gross negligence;

l. Whether Defendants' conduct, practices, statements, and representations about the Data Breach of the Sensitive Information violated applicable state laws;

m. Whether Plaintiff and Class Members were injured as a proximate cause or result of the Data Breach;

n. Whether Plaintiff and members of the Class were damaged as a proximate cause of the Data Breach;

o. Whether Defendants' practices and representations related to the Data Breach breached implied contracts with Plaintiff and members of the Class;

p. What the proper measure of damages is; and

q. Whether Plaintiff and members of the Class are entitled to restitution including, injunctive, declaratory, and/or other relief.

154. Typicality: Plaintiff's claims are typical of the claims of other members of the Class in that Plaintiff, and the members of the Class, sustained damages arising out of Defendants' Data Breach, wrongful conduct and misrepresentations, false statements, concealment, and unlawful practices, and Plaintiff and members of the Class sustained similar injuries and damages, as a result of Defendants' uniform illegal conduct.

155. Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Class. Plaintiff has no interests that conflict with, or are antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff.

156. Predominance: A class action is the appropriate method for the fair and efficient adjudication of this controversy. Defendants have acted in a general manner to the damage of the Class. The presentation of separate actions by individual Class members could create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendants, and/or substantially impair or impede the ability of Class members to protect their interests. Moreover, the individual damages of each Class member are so low that it would be economically impracticable for putative Class members to bring their claims individually.

157. Superiority: This cause is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of

this controversy as joinder of all parties is impracticable. The damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendants' misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions ensured.

158. A class action is superior to individual litigation because:

a. The amount of damages available to an individual plaintiff is insufficient to make litigation addressing Defendants' conduct economically feasible in the absence of the class action procedural device;

b. Individualized litigation would present a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system; and

c. The class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

159. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendants failed to timely and adequately notify the public of the Data Breach;

b. Whether Defendants owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Sensitive Information;

c. Whether Defendants' security measures to protect data systems were reasonable in light of best practices recommended by data security experts;

d. Whether Defendants' failure to institute adequate protective security measures amounted to negligence;

e. Whether Defendants failed to take commercially reasonable steps to safeguard consumer Sensitive Information; and

f. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

160. Finally, all members of the proposed Class are readily ascertainable. Defendants have access to all Class Members' names and addresses impacted by the Data Breach.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
***(On Behalf of Plaintiff & the Class)***

161. Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

162. Defendants required their clients' patients, including Plaintiff and Class Members, to submit their Sensitive Information in order to receive medical services and/or obtain employment from healthcare providers using Defendants' products and Platform.

163. By collecting, storing, processing, and sharing this data for commercial purposes, Defendants owed a duty of care to use reasonable means to secure and safeguard their systems—and Plaintiff's and Class Members' Sensitive Information held within their systems—to prevent unauthorized disclosure and theft. This duty included an obligation to implement processes capable

of detecting breaches in a reasonably expeditious manner and to provide prompt notice to affected individuals in the event of such a breach.

164. Defendants owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards, federal regulations, and the requirements discussed herein, and to ensure that their systems, networks, personnel, and third-party vendors adequately protected Sensitive Information.

165. Plaintiff and Class Members were a well-defined, foreseeable, and probable group of individuals whom Defendants knew, or should have known, would be injured by inadequate data security measures.

166. Given the volume and sensitivity of the data stored and managed by Defendants, including PII and PHI, Defendants knew or should have known they were likely targets for cybercriminals and had a duty to employ reasonable and effective safeguards. The foreseeable risk of injury to Plaintiff and Class Members imposed a duty to implement adequate security controls.

167. PII and PHI is highly valuable, and Defendants knew or should have known the risks involved in obtaining, using, handling, emailing, and storing the Sensitive Information of Plaintiff and Class Members. Accordingly, Defendants had a duty to exercise reasonable care in protecting the Sensitive Information entrusted to them.

168. Defendants' duty of care also arose from the special relationship between Defendants and the patients of healthcare providers using Defendants' services—a relationship recognized by common law and by regulations including, but not limited to, HIPAA. Defendants were in a superior position to protect against the foreseeable risk of harm from a data breach.

169. Defendants' duties under HIPAA included "reasonably protecting" confidential data from "any intentional or unintentional use or disclosure" and implementing "appropriate

administrative, technical, and physical safeguards" to preserve the privacy and security of protected health information. Some or all of the medical information at issue constitutes "protected health information" under HIPAA.

170. Defendants were also obligated to employ reasonable security measures under Section 5 of the FTC Act, which prohibits "unfair . . . practices in or affecting commerce," including the failure to use reasonable safeguards for protecting confidential information.

171. Defendants' duty to safeguard Sensitive Information arose not only from statutes and regulations, but also from industry standards requiring that entities storing such data implement effective and reasonable security protocols.

172. Defendants breached these duties by failing to implement reasonable security measures. Their specific negligent acts and omissions include, but are not limited to:

a. Failing to adopt, implement, and maintain adequate data security measures;

b. Failing to adequately monitor their networks and systems;

c. Failing to implement effective breach mitigation policies and procedures;

d. Allowing unauthorized access to Plaintiff's and Class Members' Sensitive Information;

e. Failing to detect in a timely manner that such information had been compromised; and

f. Failing to timely notify Plaintiff and Class Members so that they could mitigate the risks of identity theft and other harm.

173. Defendants further breached their duties by ignoring known data security deficiencies and allowing unauthorized third parties to access the Sensitive Information of Plaintiff and Class Members.

174. Defendants' failure to follow both federal regulatory standards and widely accepted industry norms reflects a lack of reasonable care and constitutes negligence.

175. But for Defendants' wrongful and negligent conduct, Plaintiff's and Class Members' Sensitive Information would not have been compromised, exfiltrated, or viewed by unauthorized persons. Defendants' actions were the direct and proximate cause of the data breach and resulting harm.

176. It was foreseeable that Defendants' failure to implement adequate safeguards would result in harm to Plaintiff and Class Members, particularly given the frequency of cyberattacks targeting the healthcare industry.

177. Thus, it was foreseeable that Defendants' conduct would cause injury to Plaintiff and Class Members in the form of identity theft, fraud, financial loss, and emotional distress.

178. As a result of Defendants' misconduct, the Sensitive Information of Plaintiff and Class Members was compromised, placing them at a heightened and ongoing risk of identity theft, fraud, and unauthorized disclosure.

179. Plaintiff and Class Members are entitled to compensatory and consequential damages for the harm they suffered as a result of the data breach in an amount to be proven at trial.

180. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to: (i) enhance their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) continue providing adequate identity theft protection and credit monitoring services to Plaintiff and Class Members.

## COUNT II
### NEGLIGENCE PER SE
***(On Behalf of Plaintiff & the Class)***

181. Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

182. Plaintiff alleges this negligence *per se* theory as an alternative to Count I.

183. Pursuant to the laws set forth herein, including the FTC Act, HIPAA, the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C, and the other sections identified above, Defendants were required by law to maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiff's and Class Members' Sensitive Information.

184. Pursuant to the FTC Act, Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Sensitive Information. Specifically, this statute prohibits "unfair . . . practices in or affecting commerce," including (as interpreted and enforced by the FTC) the unfair practice of failing to use reasonable measures to protect confidential data.

185. Moreover, Plaintiff's and Class Members' injuries are precisely the type of injuries that the FTC Act guards against. The FTC has pursued numerous enforcement actions against businesses that, due to their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the very same injuries that Defendants inflicted upon Plaintiff and Class Members.

186. Pursuant to HIPAA, Defendants had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' Sensitive Information. Defendants had a duty to use reasonable security measures to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." Some or all of the

medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

187. Pursuant to HIPAA, Defendants had a duty to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key."[32]

188. Plaintiff and Class Members are within the class of persons that HIPAA was intended to protect. And the injuries that Defendants inflicted on Plaintiff and Class Members are precisely the harms that HIPAA guards against. The Federal Health and Human Services' Office for Civil Rights ("OCR") has pursued enforcement actions against businesses which—because of their failure to employ reasonable data security measures for PHI—caused the very same injuries that Defendants inflicted upon Plaintiff and Class Members.

189. Under the Health Information Technology for Economic and Clinical Health Act ("HITECH"), Defendants had a duty to promptly notify "without unreasonable delay and in no case later than 60 calendar days after the discovery of a breach" the respective covered entities and affected persons so that the entities and persons could take action to protect themselves.

190. Moreover, HITECH provides that, "[a] covered entity that accesses, maintains, retains, modifies, records, stores, destroys, or otherwise holds, uses, or discloses unsecured protected health information (as defined in subsection (h)(1)) shall, in the case of a breach of such information that is discovered by the covered entity, notify each individual whose unsecured protected health information has been, or is reasonably believed by the covered entity to have been, accessed, acquired, or disclosed as a result of such breach."

191. HITECH further provides, "[a] business associate of a covered entity that accesses, maintains, retains, modifies, records, stores, destroys, or otherwise holds, uses, or discloses unsecured protected health information shall, following the discovery of a breach of such information, notify the covered entity of such breach. Such notice shall include the identification of each individual whose unsecured protected health information has been or is reasonably believed by the business associate to have been, accessed, acquired, or disclosed during such breach."

192. Defendants' duty to use reasonable care in protecting confidential data arose not only because of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential PII and PHI.

193. Defendants owed Plaintiff and Class Members a duty to notify them within a reasonable time frame of any breach to their Sensitive Information. Defendants also owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. This duty is necessary for Plaintiff and Class Members to take appropriate measures to protect their Sensitive Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps in an effort to mitigate the fallout of the Data Breach.

194. Defendants owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants knew or should have known would suffer injury-in-fact from their inadequate security protocols. Defendants actively sought and obtained the Sensitive Information of Plaintiff and Class Members.

195. Defendants breached their duties to Plaintiff and Class Members under the FTCA, HIPAA, and HITECH by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Sensitive Information. But for

Defendants' negligence, Plaintiff and Class Members would not have been injured. The specific negligent acts and omissions committed by Defendants include, but are not limited to:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' Sensitive Information;

b. Failing to comply with—and thus violating—HIPAA and its regulations;

c. Failing to comply with—and thus violating—HITECH and its regulations;

d. Failing to comply with—and thus violating—FTCA and its regulations;

e. Failing to adequately monitor the security of their networks and systems;

f. Failing to have in place mitigation policies and procedures;

g. Allowing unauthorized access to Plaintiff's and Class Members' Sensitive Information;

h. Failing to detect in a timely manner that Plaintiff's and Class Members' Sensitive Information had been compromised; and

i. Failing to timely notify Plaintiff and Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

196. Defendants' failure to comply with applicable laws and regulations constitutes negligence per se.

197. But for Defendants' wrongful and negligent breach of their duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

198. The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they were failing to meet their duties and that their breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Sensitive Information.

199. Defendants' negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injuries-in-fact and damages. These injuries include, but are not limited to, the theft of their Sensitive Information by criminals, improper disclosure of their Sensitive Information, lost benefit of their bargain, lost value of their Sensitive Information, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendants' negligence. Moreover, these injuries are ongoing, imminent, and immediate.

200. As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

201. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to Plaintiff and all Class Members.

## COUNT III
### INVASION OF PRIVACY
***(On Behalf of Plaintiff & the Class)***

202. Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

203. Plaintiff and the Class were subjected, through the Data Breach, to an offensive intrusion into private information.

204. This intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class disclosed their sensitive and confidential information to Defendants as part of receiving healthcare services and/or in the course of obtaining employment, but they did so

privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

205. Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and PHI and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

206. Defendants owed a duty to their clients and their clients' patients, including Plaintiff and the Class, to keep this information confidential.

207. The unauthorized acquisition (i.e., theft) by a third party of Plaintiff's and Class Members' PII and PHI is highly offensive to a reasonable person.

208. The Data Breach constitutes an intentional interference with Plaintiff's and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

209. Defendants acted with a knowing state of mind when they permitted the Data Breach because they knew their information security practices were inadequate.

210. Defendants acted with a knowing state of mind when they failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

211. Acting with knowledge, Defendants had notice and knew that their inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

212. As a proximate result of Defendants' acts and omissions, the private and sensitive PII and PHI of Plaintiff and the Class were stolen by a third party and is now available for

disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages.

213. Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class because their PII and PHI are still maintained by Defendants with their inadequate cybersecurity systems and policies.

214. Plaintiff and the Class have no adequate remedy at law for the injuries relating to Defendants' continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendants' inability to safeguard the PII and PHI of Plaintiff and the Class.

215. In addition to injunctive relief, Plaintiff, on behalf of himself and the other members of the Class, also seeks compensatory damages for Defendants' invasion of privacy, which includes the value of the privacy interest invaded by Defendants, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

## COUNT IV
### BREACH OF IMPLIED CONTRACT
***(On Behalf of Plaintiff & the Class)***

216. Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

217. Defendants required Plaintiff and Class Members to provide and entrust their Sensitive Information as a condition of obtaining services from Defendants' clients and/or obtaining employment with Defendants.

218. Plaintiff and Class Members paid money to Defendants, directly and/or indirectly, in exchange for goods, services, and/or employment, as well as Defendants' promise to protect their Sensitive Information from unauthorized disclosure.

219. Defendants promised to comply with legal and industry standards, including HIPAA, and to make sure that Plaintiff's and Class Members' Sensitive Information would remain protected.

220. Implicit in the agreement between Defendants and Plaintiff and Class Members was the obligation that both parties would maintain the Sensitive Information confidentially and securely.

221. Defendants had an implied duty of good faith to ensure that the Sensitive Information of Plaintiff and Class Members in their possession was used only as authorized, such as to provide medical treatment, other medical benefits and/or employment benefits from Defendants.

222. Defendants had an implied duty to protect the Sensitive Information of Plaintiff and Class Members from unauthorized disclosure or uses.

223. Additionally, Defendants implicitly promised to retain this Sensitive Information only under conditions that kept such information secure and confidential.

224. Through their course of conduct, Defendants, Plaintiff and Class Members entered into implied contracts for Defendants to implement data security adequate to safeguard and protect the privacy of Plaintiff's and Class Members' Sensitive Information.

225. Defendants solicited and invited Plaintiff and Class Members to provide their Sensitive Information as part of Defendants' regular business practices. Plaintiff and Class Members accepted Defendants' offers and provided their Sensitive Information to Defendants.

226. Plaintiff and Class Members fully performed their obligations under the implied contract with Defendants. Defendants did not. Plaintiff and Class Members would not have provided their confidential Sensitive Information to Defendants in the absence of their implied contracts and would have instead retained the opportunity to control their Sensitive Information for uses other than medical treatment and obtaining medical and/or employment benefits from Defendants.

227. Defendants breached the implied contracts with Plaintiff and Class Members by failing to safeguard and protect Plaintiff's and Class Members' Sensitive Information; failing to provide timely and accurate notice to Plaintiff and Class Members that their Sensitive Information was compromised as a result of the Data Breach; and violating industry standards as well as legal obligations that are necessarily incorporated into implied contracts between Plaintiff, Class Members, and Defendants.

228. Defendants further breached the implied contracts with Plaintiff and Class Members by failing to comply with their promise to abide by HIPAA.

229. Defendants further breached the implied contracts with Plaintiff and Class Members by failing to ensure the confidentiality and integrity of electronic protected health information Defendants created, received, maintained, and transmitted in violation of 45 C.F.R. §164.306(a)(1).

230. Defendants further breached the implied contracts with Plaintiff and Class Members by failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. §164.308(a)(1).

231. Defendants further breached the implied contracts with Plaintiff and Class Members by failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. §164.306(a)(2).

232. Defendants' failures to meet these promises constitute breaches of the implied contracts.

233. Furthermore, the failure to meet their confidentiality and privacy obligations resulted in Defendants providing goods and services to Plaintiff and Class Members that were of a diminished value.

234. Defendants' acts and omissions have materially affected the intended purpose of the implied contracts requiring Plaintiff and Class Members to provide their Sensitive Information in exchange for medical treatment and services and employment benefits.

235. As a direct and proximate result of Defendants' above-described breach of implied contract, Plaintiff and Class Members have suffered (and will continue to suffer) (a) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; (b) actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; (c) loss of the confidentiality of the stolen confidential data; (d) the possibility of an illegal sale of the compromised data on the dark web; (e) lost work time; and (f) other economic and non-economic harm.

236. As a direct and proximate result of Defendants' above-described breach of contract, Plaintiff and Class Members are entitled to recover actual, consequential, and nominal damages.

## COUNT V
**UNJUST ENRICHMENT**
***(On Behalf of Plaintiff & the Class)***

237. Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

238. This claim is pleaded solely in the alternative to Plaintiff's breach of implied contract claim.

239. Plaintiff and Class Members conferred a monetary benefit on Defendants by directly or indirectly paying money for healthcare services and/or in the course of obtaining employment that relied on Defendants to render certain services, a portion of which was intended to have been used by Defendants for data security measures to secure Plaintiff's and Class Members' Sensitive Information. Plaintiff and Class Members further conferred a benefit on Defendants by entrusting their Sensitive Information to Defendants from which Defendants derived profits.

240. Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Sensitive Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide adequate security.

241. Under the principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

242. Defendants acquired the monetary benefit, PII, and PHI through inequitable means in that Defendants failed to disclose the inadequate security practices, as described herein, and failed to maintain adequate data security.

243. If Plaintiff and Class Members knew that Defendants had not secured their Sensitive Information, they would not have agreed to give their money, or disclosed their data, to healthcare providers using Defendants' services.

244. Plaintiff and Class Members have no other adequate remedy at law.

245. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered, and will continue to suffer, a host of injuries, including, but not limited to: (1) actual identity theft; (2) the loss of the opportunity to determine how their Sensitive Information is used; (3) the compromise, publication, and/or theft of their Sensitive Information; (4) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Sensitive Information; (5) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (6) the continued risk to their Sensitive Information, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the Sensitive Information in their possession; and (7) future expenditures of time, effort, and money that will be spent trying to prevent, detect, contest, and repair the impact of Defendants' Data Breach.

246. The benefits that Defendants derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles

for Defendants to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and data security practices alleged in this Complaint.

247. Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds they received as a result of their conduct and the Data Breach alleged herein.

**COUNT VI**
**BREACH OF FIDUCIARY DUTY**
***(On Behalf of Plaintiff & the Class)***

248. Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

249. In light of the special relationship between Defendants and Plaintiff and Class Members whereby Defendants became guardian of Plaintiff's and Class Members' Sensitive Information, Defendants became fiduciaries by undertaking and guardianship of the Sensitive Information, acting primarily for the benefit if Plaintiff and Class Members, (1) to safeguard Plaintiff's and Class Members' Sensitive Information; (2) to timely notify Plaintiff and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendants did and do store.

250. Defendants breached their fiduciary duties to Plaintiff and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiff's and Class Members' Sensitive Information.

251. Defendants breached their fiduciary duties owed to Plaintiff and Class Members by failing to timely notify and/or warn Plaintiff and Class Members of the Data Breach.

252. Defendants breached their fiduciary duties to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' Sensitive Information.

253. As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Sensitive Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Sensitive Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Sensitive Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Sensitive Information in their continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (vii) the diminished value of the services they received.

254. As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiff and Class Members have suffered, and will continue to suffer other forms of injury and/or harm, as well as other economic and non-economic losses.

## COUNT VII
### BREACH OF THIRD-PARTY BENEFICIARY CONTRACT
***(On Behalf of Plaintiff & the Class)***

255. Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

256. On information and belief, Defendants entered into contracts to provide services to their clients, which included digital imaging and data hosting solutions for healthcare providers

and facilities, including the secure handling and storage of Sensitive Information belonging to patients.

257. On information and belief, these contracts were substantially similar in form and were made expressly for the benefit of Plaintiff and Class Members, as it was their Sensitive Information that Defendants agreed to receive, host, and protect through their services. Thus, the collection and protection of Sensitive Information belonging to Plaintiff and Class Members was the direct and primary objective of the contracting parties.

258. Defendants knew that if they were to breach these contracts with their clients, the clients' patients, including Plaintiff and Class Members, would be foreseeably and directly harmed.

259. Defendants breached their contracts with their clients—whose patients, including Plaintiff and Class Members, were affected by the Data Breach—when they failed to use reasonable data security measures that could have prevented the Data Breach, and when they failed to timely notify Plaintiff and Class Members regarding the breach.

260. As foreseen, Plaintiff and Class Members were harmed by Defendants' failure to use reasonable data security measures to protect the Sensitive Information that Plaintiff and Class Members provided to their healthcare providers, which was then shared with Defendants, and by the failure to provide timely notice, including but not limited to the continuous and substantial risk of harm resulting from the loss of their Sensitive Information.

261. Accordingly, Plaintiff and Class Members are entitled to damages in an amount to be determined at trial, including actual, consequential, and nominal damages, along with costs and attorneys' fees incurred in this action.

## COUNT VIII
### BAILMENT
***(On Behalf of Plaintiff & the Class)***

262. Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

263. Plaintiff and Class Members provided Sensitive Information to Defendants—either directly or through healthcare providers and their business associates—which Defendants were under a duty to keep private and confidential.

264. Plaintiff's and Class Members' Sensitive Information is personal property, and it was conveyed to Defendants for the certain purpose of keeping the information private and confidential.

265. Plaintiff's and Class Members' Sensitive Information has value and is highly prized by hackers and criminals.

266. Defendants were aware of the risks they took when accepting the Sensitive Information for safeguarding and assumed the risk voluntarily.

267. Once Defendants accepted Plaintiff's and Class Members' Sensitive Information, it was in the exclusive possession of that information, and neither Plaintiff nor Class Members could control that information once it was within the possession, custody, and control of Defendants.

268. Defendants did not safeguard Plaintiff's or Class Members' Sensitive Information when they failed to adopt and enforce adequate security safeguards to prevent a known risk of a cyberattack.

269. Defendants' failure to safeguard Plaintiff's and Class Members' Sensitive Information resulted in that information being accessed or obtained by third-party cybercriminals.

270. As a result of Defendants' failure to keep Plaintiff's and Class Members' Sensitive Information secure, Plaintiff and Class Members suffered injury, for which compensation, including nominal damages and compensatory damages, is appropriate.

**COUNT IX**
**VIOLATION OF THE WASHINGTON STATE CONSUMER PROTECTION ACT**
**RCW 19.86.010 *et seq.***
***(On Behalf of Plaintiff Papetti & the Class)***

271. Plaintiff realleges and incorporates all other paragraphs in the Complaint as if fully set forth herein.

272. The Washington State Consumer Protection Act, RCW 19.86.020 (the "CPA") prohibits any "unfair or deceptive acts or practices" in the conduct of any trade or commerce as those terms are described by the CPA and relevant case law.

273. Defendants meet the definition of "person" as described in RCW 19.86.010(1).

274. Defendants engage in "trade" and "commerce" as described in RCW 19.86.010(2) in that they engage in the sale of services and commerce directly and indirectly affecting the people of the State of Washington.

275. By virtue of the above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, Defendants engaged in unlawful, unfair and fraudulent practices within the meaning, and in violation of, the CPA, in that Defendants' practices were injurious to the public interest because they injured other persons, had and continue to have the capacity to injure other persons.

276. In the course of conducting their business, Defendants committed "unfair or deceptive acts or practices" by, *inter alia*, knowingly failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff's and

Class Members' Sensitive Information, and violating the common law alleged herein in the process. Plaintiff and Class Members reserve the right to allege other violations of law by Defendants constituting other unlawful business acts or practices. As described above, Defendants' wrongful actions, inaction, omissions, and want of ordinary care are ongoing and continue to this date.

277. Defendants also violated the CPA by failing to timely notify and concealing from Plaintiff and Class Members information regarding the unauthorized release and disclosure of their Sensitive Information. If Plaintiff and Class Members had been notified in an appropriate fashion, and had the information not been hidden from them, they could have taken precautions to safeguard and protect their Sensitive Information, medical information, and identities.

278. Defendants' above-described wrongful actions, inaction, omissions, want of ordinary care, misrepresentations, practices, and/or non-disclosures also constitute "unfair or deceptive acts or practices" in violation of the CPA in that Defendants' wrongful conduct is substantially injurious to other persons, had the capacity to injure other persons, and has the capacity to injure other persons.

279. The gravity of Defendants' wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendants' legitimate business interests other than engaging in the above-described wrongful conduct.

280. As a direct and proximate result of Defendants' above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach and their violations of the CPA, Plaintiff and Class Members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*, (1) an imminent, immediate and the continuing increased risk of identity theft, identity fraud and

medical fraud—risks which justify expenditures for protective and remedial services for which they are entitled to compensation; (2) invasion of privacy; (3) breach of the confidentiality of their Sensitive Information; (4) deprivation of the value of their Sensitive Information, for which there is a well-established national and international market; and/or (5) the financial and temporal cost of monitoring credit, monitoring financial accounts, and mitigating damages.

281. Unless restrained and enjoined, Defendants will continue to engage in the above described wrongful conduct and more data breaches will occur. Plaintiff, therefore, on behalf of himself and Class Members, seeks restitution and an injunction prohibiting Defendant from continuing such wrongful conduct, and requiring Defendants to design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures protocols, and software and hardware systems to safeguard and protect the Sensitive Information entrusted to it.

282. Plaintiff, on behalf of themselves and Class Members, also seeks to recover actual damages sustained by each of Class Members together with the costs of the suit, including reasonable attorneys' fees. In addition, Plaintiff, on behalf of themselves and Class Members, requests that this Court use its discretion, pursuant to RCW 19.86.090, to increase the damages award for each Class Member by three times the actual damages sustained not to exceed $25,000.00 per Class Member.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Michael Papetti, on behalf of himself and all persons similarly situated, prays for judgment in favor of themselves against Defendants DICOM Grid, Inc. d/b/a Ambra Health and Intelerad, Inc. d/b/a Intelerad Medical Systems, and respectfully request that this Honorable Court enter an order:

A. Certifying this action as a Class action and appointing Plaintiff as Class Representative and his counsel as Class Counsel;

B. Granting equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Sensitive Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C. Granting equitable relief compelling Defendants to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Sensitive Information compromised during the Data Breach;

D. Granting equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

E. Requiring Defendants to pay for not less than three years of credit monitoring services for Plaintiff and the Class;

F. Awarding actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G. Awarding punitive damages, as allowable by law;

H. Awarding attorneys' fees and costs under the common fund doctrine, and any other applicable law;

I. Awarding costs and any other expense, including expert witness fees, incurred by Plaintiff in connection with this action;

J. Awarding pre- and post-judgment interest on any amounts awarded; and

K. All such other and further relief as this court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: October 8, 2025

Respectfully submitted,

/s/ David M. Wilkerson
David M. Wilkerson
N.C. Bar No. 35742
**WILKERSON JUSTUS PLLC**
9 SW Pack Square, Suite 301
Asheville, NC 28801
Tel: (828) 316-6902
dwilkerson@wilkersonjustus.com

Local Civil Rule 83.1(d) Counsel for Plaintiffs

M. Anderson Berry*
Brook E. Garberding*
Gregory Haroutunian*
**EMERY REDDY, PLLC**
600 Stewart Street, Suite 1100
Seattle, WA 98101
Tel: (206) 442-9106
Fax: (206) 441-9711
Email: anderson@emeryreddy.com
Email: brook@emeryreddy.com
Email: gregory@emeryreddy.com

**Pro hac vice* applications forthcoming

*Attorneys for Plaintiff and the Proposed Class*